E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Assistant United States Attorney
Chief, Environmental and Community Safety Crimes Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorney
Environmental and Community Safety Crimes Section
MAXWELL COLL (Cal. Bar No. 312651)
Assistant United States Attorney
Asset Forfeiture and Recovery Section
      1300 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone:  (213) 894-3359/8644/1785
      E-mail:    Mark.A.Williams@usdoj.gov
                 Matthew.O'Brien@usdoj.gov
                 Maxwell.Coll@usdoj.gov

KENNTEH A. POLITE, JR.
Assistant Attorney General
Criminal Division
CHRISTIAN A. LEVESQUE (D.C. Bar No. 501778)
Trial Attorney
Human Rights and Special Prosecutions Section
United States Department of Justice
      1301 New York Ave
      Washington, DC 20530
      Telephone:  (202) 538-2373
      E-mail:    Christian.Levesque@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>MOHAMAD YASSIN ALCHARIHI,<br>  aka "Mohamad al-Sharihi" and<br>  "Mohamad AlCharihi,<br><br>          Defendant. | No. CR 20-307-GW<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* RE: DEFENSE WITNESS BELAL ALJRAD<br><br>Hearing Date: April 20, 2023<br>Hearing Time: 11:00 a.m.<br>Location:    Courtroom of the<br>             Hon. George H. Wu |

The United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mark Williams, Matthew O'Brien, and Maxwell Coll, and Trial Attorney Christian Levesque, hereby files this Opposition to Defendant's Motion In Limine Re: Defense Witness Belal AlJrad.

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.[1]

Dated: April 19, 2023          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
MARK A. WILLIAMS
MATTHEW W. O'BRIEN
MAXWELL COLL
Assistant United States Attorneys

KENNETH A. POLITE
Assistant Attorney General
Criminal Division


_____/s/_____
CHRISTIAN A. LEVESQUE
Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

---

[1] The government apologizes to the Court for filing this brief the night before the noticed hearing, but the government received defendant's motion only three business days ago and the undersigned counsel spent most of April 18, 2023 attending a Rule 15 deposition of a defense witness in this case.

2

1

**TABLE OF CONTENTS**

2

3   I.    INTRODUCTION...................................................1

4   II.   BACKGROUND.....................................................2

5         A.   The Discovery of the Mosaic.............................2

6         B.   The Importation of the Mosaic...........................3

7         C.   The Efforts To Sell the Mosaic..........................4

8         D.   AlJrad's Lies at His Interview..........................4

9         E.   AlJrad's Terrorist Links................................4

10  III.  ARGUMENT.......................................................7

11        A.   The Government Does Not Oppose Conducting AlJrad's
               Testimony by Live Video Teleconferencing, Provided the
12             Testimony Occurs at the U.S. Embassy in Riyadh, Saudi
               Arabia..................................................7

13

14        B.   The Denial of AlJrad's Visa Application on Terrorism-
               Related Grounds Is Relevant and Admissible..............9

15             1.   The Evidence Is Admissible for Impeachment
                    Purposes...........................................9

16

17             2.   AlJrad's Terrorism Ties Are Admissible To
                    Corroborate the Government's Theory of the Case:
18                  The Mosaic was Looted and Smuggled................11

19             3.   The Terrorism Evidence Is Not Unfairly
                    Prejudicial Under Rule 403........................12

20  IV.   CONCLUSION....................................................13

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Defendant and his associates, including Belal AlJrad, conspired to smuggle a valuable ancient Roman mosaic (the "Mosaic") from Syria through Turkey and into the United States in order to sell it for a massive profit.  Defendant and AlJrad communicated regularly - often on a daily basis - about the scheme to smuggle the Mosaic, restore it, and sell it.

Despite AlJrad's considerable baggage, defendant seeks to call AlJrad as a defense witness at trial.  The government anticipates cross-examining AlJrad on a host of incriminating issues.  As such, the government attempted to facilitate AlJrad's visa application, and even issued – at the defense's request – a "safe passage" letter to AlJrad promising not to arrest him for his role in the scheme while he was in Los Angeles for this trial.  However, the U.S. Department of State subsequently denied AlJrad's visa application on terrorism-related grounds.

When defendant requested that AlJrad be permitted to testify at trial by live video-teleconference ("VTC") from Saudi Arabia, the government did not object.  Indeed, the government again facilitated the defense's request by arranging for the testimony to be carried out at a U.S. Embassy, and issued a second "safe passage" letter promising not to arrest AlJrad during his testimony.

Defendant now seeks to elicit supposedly exculpatory testimony from AlJrad, his co-conspirator who is safely 8,000 miles away, while precluding the government from presenting evidence that AlJrad was denied a visa to testify in Los Angeles on terrorism-related grounds.  Defendant cannot have it both ways.  If defendant wants to use AlJrad

as a witness, the government must be permitted to impeach AlJrad on all available grounds, including evidence of AlJrad's visa denial on terrorism-related grounds.

**II.   BACKGROUND**

Defendant and AlJrad conspired to smuggle and resell the Mosaic. The government intends to introduce, <u>inter alia</u>, the following evidence, based primarily on seized communications between defendant and AlJrad.  The government summarizes this evidence below so that the Court can appreciate AlJrad's central role in the scheme, and hence the centrality of his credibility – or lack thereof – at trial.

**A.   The Discovery of the Mosaic**

Defendant and AlJrad communicated extensively about the discovery of the Mosaic.  For example, on January 1, 2015, AlJrad messaged defendant about the Mosaic (perhaps for the first time) and said that he needed to think of how he could deliver the Mosaic to defendant.   AlJrad told defendant that the price of the Mosaic could reach one million dollars.  Defendant asked AlJrad if the Mosaic was Roman, and AlJrad responded that the faces of the Mosaic belong to Greeks - Zeus and Hercules.  On January 3, 2015, defendant asked AlJrad whether the Mosaic was on the wall or on the floor, and AlJrad said that the Mosaic was discovered on the floor.  That same day, AlJrad sent emails to the Louvre and Sotheby's attaching photographs of the Mosaic.

On January 12, 2015, AlJrad sent an email to Edgar Owen, an arts dealer, attaching photographs of the Mosaic.  Owen responded that the Mosaic might be worth $100,000 to $200,000.  AlJrad quickly forwarded Owen's estimate to defendant.

**B.   The Importation of the Mosaic**

Defendant and AlJrad exchanged messages about their plan to hide the Mosaic in a shipping container bound for Los Angeles by concealing the Mosaic behind approximately 80 cheap vases.  On March 6, 2015, defendant told AlJrad that the Mosaic was priceless and that they needed documents to get the Mosaic into the United States.  When preparing for the shipment, AlJrad told defendant that the vases used to disguise the Mosaic in the shipment were causing a delay; defendant responded to AlJrad that this was ironic because the vases were included in the shipment so that there would not be any problems, but now the vases had become the problem.  After the shipment arrived in the United States, defendant discovered that the vases were broken.  But this did not matter.  Defendant messaged AlJrad stating that everything was working as planned.

On July 14, 2015, AlJrad messaged defendant that he had some bad news because a different piece was caught at the border (likely the Syria-Turkey border).  Defendant asked AlJrad if the Turks caught it, and AlJrad responded that yes, the smuggler had made a mistake and lost it.  Defendant asked about a different mosaic, and AlJrad responded that there was good fortune that both were not caught.  AlJrad also messaged defendant about Interpol, noting that Interpol was searching for a mosaic panel.  AlJrad stated that Interpol was searching for the first mosaic, the second one got caught, and that he prayed that God would save the third (i.e., the Mosaic in this case).  On June 13, 2015, before the Mosaic entered the United States, AlJrad emailed himself an Interpol article regarding the looting of ancient mosaics from Syria.

3

### C.   The Efforts To Sell the Mosaic

After the Mosaic entered the United States, defendant and AlJrad communicated regularly about the restoration and sale of the Mosaic. They communicated about the creation of fake documents needed to sell the Mosaic.  For example, on August 27, 2015, after the Mosaic entered the United States, defendant told AlJrad that documents from a museum in Idlib, Syria, were necessary in order to sell the Mosaic. When creating some of the fake documents, defendant told AlJrad that there were too many unnecessary stamps on the documents and that this would attract suspicion; AlJrad tried to assuage defendant's concerns by responding that the number of stamps was common on official documents.

### D.   AlJrad's Lies at His Interview

On March 15, 2021, Saudi officials interviewed AlJrad in Jeddah, Saudi Arabia, pursuant to the government's MLAT request relating to this prosecution.  FBI agents and Saudi law enforcement officials attended the interview.  During the interview, AlJrad made numerous demonstrably false statements regarding, inter alia, his role in the scheme, his connections to the antiquities trade, the forged documents, his communications with defendant, and his knowledge of this criminal prosecution.

### E.   AlJrad's Terrorist Links

In response to the request from defendant and AlJrad, the government provided AlJrad with a "safe passage" letter, in which it agreed that the U.S. Attorney's Office for the Central District of California would not authorize the arrest of AlJrad for crimes relating to the Mosaic while he was in Los Angeles to testify at trial.  At the time, AlJrad's visa application was pending.

4

AlJrad's visa application ultimately was denied on two separate grounds by the U.S. Department of State.[1]  First, the Department of State denied AlJrad's visa application under section 212(a)(3)(B) of the Immigration and Nationality Act, which enumerates visa ineligibility on terrorism related grounds.  (Def's Mot., Exh. A.)  Second, AlJrad was denied a visa under section 306 of the Enhanced Border Security and Visa Reform Act of 2002, which prohibits admission of an alien from a country designated to be a state sponsor of international terrorism unless the Secretary has determined that such individual does not pose a risk or security threat to the United States.  (Id.)

Defendant's attempt to portray the visa denial as not necessarily relating to AlJrad's ties to terrorism is misplaced.  In fact, according to information obtained earlier today from the Department of Homeland Security, information obtained during the review of AlJrad's visa application was referred to the Security Advisory Opinion ("SAO"), which consists of intelligence components from various federal agencies.  Based on their research, AlJrad is being nominated for risk enhancement in a federal database of terrorists (the Terrorist Identities Datamart Environment, or "TIDE").

Other evidence corroborates AlJrad's ties to terrorism.  For example, on November 6, 2014, shortly before AlJrad appears to have discovered the Mosaic, he emailed himself the following photograph of individuals holding machine guns.

---

[1] Defendant's insinuation that the U.S. Attorney's Office played a role in the denial of the visa is false and nonsensical.  The undersigned counsel wanted AlJrad to testify in person, and took multiple steps to facilitate that result.



Based on open-source research, it appears that the photo depicts members of Jabhat al-Nusra, an extremist group affiliated with al-Qaeda that has conducted extensive looting in Syria. The photo appears to depict, from left to right:

- "Khalid al-Aruri" (Abu al-Miqdad/al-Qassam al-Urduni);

- "SU" (Sami al-Uraydi/Aridi/Abu Mahmud al-Shami);

- Former Dar'a head military commander "Mukhtar" (Abu Abdullah al-Maqdisi); and

- "AJ" (Iyad al-Tubaysi/Abu Jalibib/Julaybib).

Starting in 2012, Al-Nusra "expanded its operations to 11 of Syria's 13 governorates, including parts of Aleppo, Raqqa, Deir el

Zour, Daraa, and Idlib."[2]  Now known as Hay'at Tahrir al-Sham

("HTS"), the extremist group has engaged in extensive looting in

Syria.  For example, in 2013, HTS/Jabhat al-Nusra "began ransacking

historical sites, creating large networks in order to smuggle and

trade in artifacts."[3]  Smuggling networks overseen by HTS also

transported artifacts from Syria to Turkey and then HTS "oversaw the

illegal sale of these objects to other countries."[4]  This information

is corroborated by 14 articles provided by one of the government's

noticed experts, Dr. Eric Doehne, related to looting in Syria.  (See

ALC-GOV-28551-28717.)

**III.  ARGUMENT**

     Given that AlJrad's visa request has been denied, the government

does not oppose taking his testimony via VTC.  The government does

oppose defendant's request to bar the government from questioning

AlJrad about the denial of his visa.

     **A.  The Government Does Not Oppose Conducting AlJrad's Testimony by Live Video Teleconferencing, Provided the Testimony Occurs at the U.S. Embassy in Riyadh, Saudi Arabia.**

     The defense has asserted that AlJrad has material and relevant

information that may counter the government's theory of the case.

The government's strong preference was for AlJrad to appear at trial

in person where the government could cross-examine him under oath in

front of the jury.

---

[2] See https://cisac.fsi.stanford.edu/mappingmilitants/profiles/hayat-tahrir-al-sham.

[3] See https://www.mei.edu/publications/economics-hayat-tahrir-al-sham.

[4] See https://www.atlanticcouncil.org/blogs/syriasource/the-destruction-and-looting-of-idlib-s-ancient-heritage-by-extremists/.

1    Given that AlJrad's visa to travel to the United States has been
2    denied, the government does not oppose taking his testimony via live
3    VTC, provided it occurs at the U.S. Embassy in Riyadh, Saudi Arabia.
4    Conducting AlJrad's examination at the embassy serves several
5    purposes.  First, it will ensure there is adequate security, which is
6    important given AlJrad's terrorist links.  Second, it will ensure
7    that the government has an opportunity to conduct a fulsome cross
8    examination of AlJrad.  Third, AlJrad will be sworn to an oath to
9    tell the truth in an environment where a U.S. official can be
10   present, and the integrity of the criminal judicial process will be
11   upheld as much as possible (despite AlJrad's credibility issues).
12   Testifying in a less solemn environment would not accomplish these
13   goals and would leave the process susceptible to undue influence on
14   AlJrad's testimony.  For example, if AlJrad were to testify outside
15   of an embassy, no one would be present to observe the process and
16   ensure, as much as possible, that it would mirror the environment of
17   open court where a witness testifies without phones, notes, or under
18   other circumstances that could influence the testimony.

19   The defense has agreed to the above terms.  Courts have approved
20   live VTC testimony in criminal proceedings in environments where the
21   gravity and solemnity of providing testimony in a criminal proceeding
22   can be observed.  See, e.g., United States v. Beaman, 322 F. Supp. 2d
23   1033, 1035 (D. N.D. 2004) (finding, in a criminal case, that there
24   were appropriate safeguards such that witness testimony via real-
25   time video conference would not deprive defendant of his right to
26   confront the witness, where the witness was under oath, subject to
27   cross-examination, and observable by the jurors, counsel, defendant,
28   and the court); United States v. Smith, Crim. No. 1:09-CR-100, 2010

8

1   WL 5211498, at *2 (W.D.N.C. Dec. 16, 2010) (permitting Oklahoma-based

2   expert to testify by contemporaneous transmission in North

3   Carolina trial and relying on Civil Procedure Rule 43(a) for

4   guidance) (citing Maryland v. Craig, 497 U.S. 836, 849 (1990)).

5       For all these reasons, the government does not object to AlJrad

6   testifying via live VTC, provided his testimony can occur at the U.S.

7   Embassy in Riyadh, Saudi Arabia, as planned.

8   **B.    The Denial of AlJrad's Visa Application on Terrorism-
9          Related Grounds Is Relevant and Admissible**

10      The State Department's denial of AlJrad's visa application on

11  terrorism-related grounds is admissible for two independent reasons:

12  (1) to impeach AlJrad as to his bias and credibility; and (2) to

13  corroborate other evidence that AlJrad looted the Mosaic from Syria,

14  and then smuggled it into Turkey (and then the United States), a

15  common practice of terrorism groups, including HTS, as discussed

16  above.

17      1.   The Evidence Is Admissible for Impeachment Purposes

18      Based on the demonstrably false statements that AlJrad made

19  during his MLAT interview in Saudi Arabia in March 2021 (in the

20  presence of FBI agents and Saudi law enforcement officials), the

21  government anticipates that AlJrad will make similarly false

22  statements at trial.  Given the apparent importance of AlJrad to the

23  defense, the government's cross-examination of AlJrad will be a

24  critical part of the trial.  The Court should deny defendant's

25  attempt to limit the government's means to conduct this cross-

26  examination.

27      The central issue here is AlJrad's bias.  His motive to lie is

28  not limited to his desire to see defendant (his friend and business

9

1    partner) acquitted, so that they can get the Mosaic back and sell it.

2    As a suspected terrorist, AlJrad's bias extends toward his disrespect

3    for the United States government, including its law enforcement

4    officers, its Customs laws and regulations, and its courts.

5         Defendant's motion discusses the Federal Rules of Evidence at

6    length.  But the Federal Rules of Evidence do not constrain the

7    government's ability here to introduce evidence for impeachment for

8    bias.  See, e.g., United States v. Abel, 469 U.S. 45, 51 (1984) ("We

9    think the lesson to be drawn from all of this is that it is

10   permissible to impeach a witness by showing his bias under the

11   Federal Rules of Evidence just as it was permissible to do so before

12   their adoption.").[5]  The government should be allowed to explore a

13   witness's anti-government and anti-United States beliefs,

14   particularly where the witness (1) has demonstrated links to

15   terrorist groups, (2) is testifying to facilitate a defendant's

16   acquittal on a criminal charge, (3) has a demonstrated history of

17   lying about the same issues on which his testimony will focus, and

18   (4) will testify about a subject matter closely linked to terrorist

19   groups.  AlJrad's ties to terrorism are relevant to support the

20   inference that his testimony will be biased and untruthful.  Hence

21

22

23

24   _____

25        [5] "Bias is a term used in the 'common law of evidence' to
     describe the relationship between a party and a witness which might
26   lead the witness to slant, unconsciously or otherwise, his testimony
     in favor of or against a party. Bias may be induced by a witness'
27   like, dislike, or fear of a party, or by the witness' self-interest.
     Proof of bias is almost always relevant because the jury, as finder
28   of fact and weigher of credibility, has historically been entitled to
     assess all evidence which might bear on the accuracy and truth of a
     witness' testimony." Abel, 469 U.S. at 52.

1   his visa denial is relevant and admissible, under both the

2   government's common-law right to impeach for bias, and Rule 608(a).[6]

3        The government has been unable to locate a case on point

4   (defendant's motion cites none).  The government suspects that this

5   is because the defense's gambit here is so unusual:  attempting to

6   put a suspected terrorist on the stand to provide exculpatory

7   testimony free from any consequences to the witness, who is 8,000

8   miles away and conveniently insulated from a prosecution for perjury.

9   Common sense dictates that, should defendant proceed with this

10  strategy, the government should be permitted to question AlJrad about

11  his biases, for which the denial of his visa on terrorism-related

12  grounds is direct evidence.

13           2.   AlJrad's Terrorism Ties Are Admissible To Corroborate
                  the Government's Theory of the Case:  The Mosaic was
14                Looted and Smuggled

15       The evidence concerning AlJrad's visa denial corroborates that

16  defendant and AlJrad engaged in a scheme to smuggle an ancient Mosaic

17  from Syria to the United States and that defendant intentionally lied

18  about the Mosaic's origin, value, and quality.  As described in Part

19  II, supra, the communications between defendant and AlJrad show that

20  they made plans to find and detect "treasures" of antiquity, sought

21  estimates for the value of the Mosaic by admitting the Mosaic was

22  from Syria, and then falsely claimed there was legitimate paperwork

23  to prove the legality of removing it from Syria.

24

25  ───────────────

26       [6] Rule 608(a) provides, in relevant part, that a "witness's
     credibility may be attacked or supported by testimony about the
27   witness's reputation for having a character for truthfulness or
     untruthfulness, or by testimony in the form of an opinion about that
28   character."  Mirroring Rule 608(a), there is an explicit exception to
     the hearsay rules for a witness's reputation concerning character.
     See Fed. R. Evid. 803(21).

Terrorist groups, including HTS, loot antiquities from conflict areas, including Syria.  AlJrad has connections to terrorist groups.  AlJrad (or co-conspirators) looted the Mosaic from Syria.  Defendant is charged with illegally bringing the looted Mosaic into the United States.  AlJrad's terrorist connections are thus inextricably intertwined with the government's case, and hence inadmissible on their own irrespective of impeachment.

The jury should be allowed to assess such evidence in the context of AlJrad's and defendant's communications about the looting of antiquities from Syria, their representations of the Mosaic's origin, and their extensive efforts to both obtain value estimates for the Mosaic and then sell it.  The basis upon which AlJrad was denied a visa and the other evidence mentioned above also are relevant to corroborating defendant's intent and motive to obscure the true origin, value, and quality of the Mosaic, defendant's desire to make a huge profit, and his intent to hide the fact that the Mosaic was looted from Syria, a country ravaged by armed conflict and terrorist activity.

### 3. The Terrorism Evidence Is Not Unfairly Prejudicial Under Rule 403

AlJrad is a demonstrated liar.  He has lied repeatedly to Saudi officials and the FBI about his involvement in defendant's scheme.  The government anticipates that he will continue these lies at defendant's trial.  Against this backdrop, AlJrad's terrorism connections are not unfairly prejudicial to the defense.  To the contrary, it would be unfairly prejudicial to the government for the Court to prevent a thorough cross-examination of AlJrad's anticipated testimony.  Given defendant's apparent gameplan to make his co-

conspirator's lies a centerpiece of the defense, the government
should not be hamstrung in its cross-examination.  Moreover,
alternatives to exclusion exist, including guarding against jury
confusion by reading a limiting instruction at the time of
examination concerning the denial of his visa.

**IV.   CONCLUSION**

For the foregoing reasons, the government opposes defendant's
motion in limine, but does not oppose defendant's request that AlJrad
testify via live VTC provided his testimony can be given at the U.S.
embassy in Riyadh, Saudi Arabia.